**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Robson Xavier Gomes

    v.                                      Civil No. 20-cv-453-LM
                                          Opinion No. 2020 DNH 081
US Department of Homeland Security,
Acting Secretary et. al.


**O R D E R**

Approximately 75 detainees being held in jail in Dover, New
Hampshire bring this class action seeking emergency relief due
to the risk of contracting COVID-19 in the jail.  These
detainees are not being held on criminal charges; they are civil
detainees awaiting resolution of their immigration cases.  Some
of them have medical conditions (or are of an age) that places
them at high risk of serious injury or death should they
contract COVID-19.  They seek various forms of relief, including
release.  The jail is run by a highly competent superintendent
who has approached this public health emergency with great
concern.  As of the date of this order, there is no evidence of
COVID-19 inside the jail.  Nonetheless, no one can dispute that,
despite the laudable leadership of the superintendent, it is
likely only a matter of time before the jail sees its first
case.  And, once the virus is inside the jail, not only are
detainees and inmates at great risk due to the nature of the

virus and the close quarters of the jail, but the community of
Dover could be at risk should large numbers of detainees or
inmates need hospital care.

The most pressing question at the outset of this case is
whether the detainees are entitled to bail hearings pending a
ruling on the merits of their constitutional claims.  The court
has answered that question in the affirmative for those
detainees who have medical conditions (or are of an age) that
render them particularly vulnerable to COVID-19.  As of May 14,
the court has conducted 11 bail hearings and released 7
detainees on conditions.  With respect to the lower-risk
detainees, the court explains in this order why it is not yet
prepared to answer the question of whether they are entitled to
bail hearings.  This order summarizes to date the procedural
history, factual background, and legal issues in this highly-
charged and important case.


                        **PROCEDURAL HISTORY**

Robson Xavier Gomes, Darwin Aliesky Cuesta-Rojas, and Jose
Nolberto Tacuri-Tacuri, on behalf of themselves and all United
States Immigration and Customs Enforcement ("ICE") detainees
held in civil immigration detention at the Strafford County
House of Corrections ("SCHOC"), have filed a petition for a writ

2

of habeas corpus along with a request for declaratory and injunctive relief.  They bring claims against the following respondents: Chad Wolf, the Acting Secretary of the United States Department of Homeland Security; Todd Lyons, the Acting Field Director of Immigration and Customs Enforcement; and Christopher Brackett, the Superintendent of the Strafford County Department of Corrections.[1]  Petitioners allege that respondents are acting with deliberate indifference to their health and safety by detaining them in conditions that impose a substantial risk of harm due to COVID-19.  Pending before the court are petitioners' amended petition,[2] motion for preliminary injunctive relief and expedited discovery, emergency motion for expedited bail hearings, and motion to certify the proposed class.[3]

On April 27, 2020, the court held a video hearing to give the parties the opportunity to address the legal standards

---

[1] ICE has an intergovernmental service agreement with the Strafford County Department of Corrections to house civil immigration detainees.  For purposes of this order, the acronym SCHOC will refer to both the detention facility and the Strafford County Department of Corrections, the entity that administers SCHOC.

[2] "First Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and Class Complaint for Declaratory and Injunctive Relief" (doc. no. 5).

[3] On May 4, 2020, the court provisionally certified the class for the limited purpose of holding expedited bail hearings for class members. (doc. no. 50).

related to petitioners' emergency motion for expedited bail
hearings.  Doc. no. 9.  After the hearing, the court issued an
order holding that the court may grant bail if petitioner
demonstrates a "substantial claim of constitutional error" and
"exceptional circumstances."  Doc. no. 35 (citing Glynn v.
Donnelly, 470 F.2d 95, 98 (1st Cir. 1972); Bader v. Coplan, No.
CIV. 02-508-JD, 2003 WL 163171, at *4 (D.N.H. Jan. 23, 2003);
Mapp v. Reno, 241 F.3d 221, 230 (2d Cir. 2001)).

On May 1, 2020, the court held an eight-hour video
evidentiary hearing about SCHOC's efforts to reduce the risk of
COVID-19 entering and spreading within the facility.  The
parties submitted a joint statement of material facts (doc. no.
47) and several exhibits.  Superintendent Christopher Brackett,
Petitioner Gomes, and two other detainees, Bairon Monroy Rosales
and Rommel Chavez, testified about the current conditions at
SCHOC.  At the end of the hearing, the court issued a decision
orally from the bench that those detainees with a condition that
placed them at higher risk for severe illness or death from
COVID-19 had demonstrated a substantial claim that respondents
have acted with deliberate indifference to their medical needs.
Due to the exceptional danger COVID-19 presents to these high-
risk detainees, the court held that they were entitled to bail

hearings.[4]  See Savino v. Souza, No. CV 20-10617-WGY, 2020 WL 1703844, at *1 (D. Mass. Apr. 8, 2020) ("Savino I"); Mapp, 241 F.3d at 230.  The court scheduled the first three bail hearings for high-risk detainees for May 4, 2020.

Unfortunately, the parties were unable to reach agreement on which detainees qualify as "high-risk."  On May 4, 2020, this court held a telephone conference to resolve this threshold question.  Following that hearing, the court issued an order explaining which detainees the court considers to be "high risk."  Doc. no. 52.  Also on May 4, the court issued an order provisionally certifying the proposed class of ICE detainees at SCHOC.  Doc. no. 50.  Later that same afternoon, the court began conducting bail hearings for the high-risk detainees.

This order lays out the court's findings and rulings with respect to both categories of detainees.  First, the order details the steps respondents have taken in response to the COVID-19 pandemic and explains in more detail why detainees with a condition that places them at high-risk for complications or death due to COVID-19 are likely to succeed on the merits of their due process claim.  The order next explains why the court is not prepared at this time to issue a ruling on whether lower-

---

[4] The court indicated that it would issue a written order outlining its findings and rulings, which would also address the claims of the detainees who are not in a high-risk category.

risk detainees are likely to succeed on the merits of their
habeas petition.

**FACTUAL BACKGROUND**

I.   The COVID-19 Pandemic

The world is currently experiencing a public health
emergency due to the spread of an infectious disease known as
the novel coronavirus or COVID-19.  On March 11, 2020, the World
Health Organization declared the outbreak of COVID-19 to be a
pandemic.  On March 13, 2020, President Donald Trump declared a
national emergency based on the threat to public health posed by
the virus.  That same day Governor Chris Sununu declared a state
of emergency in New Hampshire.

The dangers COVID-19 presents to human health are well-
documented and the number of people infected and killed by
COVID-19 has skyrocketed over the past three months.  The
following list of dates and cumulative counts of confirmed cases
and COVID-19 deaths as of those dates illustrates the
exponential spread of this virus in the United States.[5]

---

[5] CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-
updates/cases-in-us.html, drawing data from USAFACTS,
Coronavirus Locations: COVID-19 Map by County and State,
https://usafacts.org/visualizations/coronavirus-covid-19-spread-
map/, (last visited May 14, 2020).

|  **Cumulative Case Count:**  |  **Cumulative Number of deaths:**  |
| :---: | :---: |
| Feb. 6 = 11 | Feb. 6 = 1 |
| March 6 = 276 | March 6 = 19 |
| April 6 = 365,370 | April 6 = 10,938 |
| May 6 = 1,221,163 | May 6 = 73,010 |
| May 14 = 1,386,095 | May 14 = 83,167 |

The spread of infection in New Hampshire has also grown exponentially.  New Hampshire had its first confirmed case of COVID-19 on March 2, 2020.[6]  On April 6, there were 715 cases and 9 deaths from COVID-19.[7]  By May 6, 2,741 people in New Hampshire had been diagnosed with COVID-19 and 111 people had died.[8]  And, as of May 14, the date of this order, 3,299 people had COVID-19 and 150 people in New Hampshire have died.[9]

---

[6] Id., see also New Hampshire Public Radio, Updated: Tracking COVID-19 Cases and Testing in New Hampshire, https://www.nhpr.org/post/updated-tracking-covid-19-cases-and-testing-new-hampshire#stream/0, (last visited May 14, 2020).

[7] Id.

[8] Id., see also N.H. Dept. Health & Human Services, COVID-19, https://www.nh.gov/covid19/ (last visited May 14, 2020).

[9] Id.

Common symptoms of the virus include: fever, cough, shortness of breath, and chills.[10]  However, a "significant portion" of people with the virus are asymptomatic.[11]  And even those individuals who eventually develop symptoms can transmit the virus to others during the incubation period before they begin exhibiting symptoms.  Id.

These characteristics of COVID-19 make it extremely difficult to know who has the virus and who does not.  For that reason, the best way to minimize the spread of the virus is to limit face-to-face contact with others.[12]  The CDC recommends that everyone practice "social distancing" and stay at least six feet away from other people, avoid gathering in groups, and avoid crowded places or mass gatherings.[13]  Additionally, the CDC recommends that people frequently wash their hands, wear a cloth face covering around other people, and clean and disinfect

---

[10] CDC, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html, (last visited May 14, 2020).

[11] CDC, Recommendations Regarding the Use of Cloth Face Coverings, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html#studies (last visited May 14, 2020).

[12] CDC, Social Distancing, Quarantine, and Isolation, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html, (last visited May 14, 2020).

[13] Id.

frequently used surfaces daily.[14]  There is currently no proven
vaccine or treatment for the virus.  Thus, the only way to
protect ourselves and combat the spread of the virus is to
prevent exposure to it.

Although no one is spared the risk of severe illness from
COVID-19, there are individuals at a "higher risk for severe
illness from COVID-19" due to age or underlying medical
conditions.  CDC, Groups at Higher Risk for Severe Illness,
("CDC Higher Risk").[15]  These "high-risk" populations include,
among others, people who are 65 years or older, have diabetes,
serious heart conditions, or moderate to severe asthma, or who
are immunocompromised or obese.  Id.

II.  The Special Danger of the Coronavirus in Correctional and
     Detention Facilities

Some people are at a higher risk of contracting the virus
because of where they live or work.  Prisons and detention
centers are particularly susceptible to the introduction and
spread of the virus due to "crowded dormitories, shared

---

[14] CDC, How to Protect Yourself & Others,
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/prevention.html, (last visited May 14, 2020).

[15] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/groups-at-higher-risk.html (last visited May 14,
2020).

lavatories, limited medical and isolation resources, daily entry
and exit of staff members and visitors, continual introduction
of newly incarcerated or detained persons, and transport of
incarcerated or detained persons in multiperson vehicles for
court-related, medical, or security reasons."[16]  CDC, Megan
Wallace et al, "COVID-19 in Correctional and Detention
Facilities- United States, February-April 2020 ("CDC Detention
Report") (May 15, 2020).[17]  Once introduced, the virus is likely
to spread quickly in a prison environment because detainees
live, work, eat, study, and recreate in close quarters with one
another.  Additionally, detainees' access to disease prevention
measures (e.g. hand soap or cloth masks) may be limited and
there may be cultural or structural disincentives for detainees
to take preventative measures, report symptoms, or seek medical
care.  Id.

Medical professionals, including two medical experts from
the Department of Homeland Security, have warned of a "tinderbox
scenario" in ICE detention centers where the virus could spread
rapidly once introduced, endangering not just the health and

---

[16] https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm.

[17] Wallace M, Hagan L, Curran KG, et al. COVID-19 in
Correctional and Detention Facilities — United States, February-
April 2020. 69 Morbidity & Mortality Weekly Report 587, 587-90,
(May 15, 2020), https://www.cdc.gov/mmwr/volumes/69
/wr/pdfs/mm6919e1-H.pdf.

safety of the detainees, but also the public at large by overwhelming local hospitals.  See Basank v. Decker, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020);[18] see also doc. no. 5-2 at 4-6 (declaration of Dr. Marc Stern); doc. no. 5-3 at 4 (declaration of Dr. Jonathan Louis Golob).  Many courts have recognized the special danger posed by the spread of COVID-19 in prisons and detention centers.  See, e.g., Savino I, 2020 WL 1703844, at *3; Durel B. v. Decker, No. CV 20-3430 (KM), 2020 WL 1922140, at *2 (D.N.J. Apr. 21, 2020) (observing the "stark reality is that avoiding exposure to COVID-19 is impossible for most detainees and inmates" (internal quotation marks omitted)).

    As of May 14, 2020, at least 36,900 inmates or staff at state prisons, federal prisons, or local jails have become infected with COVID-19 and 375 inmates or staff have died.[19] Four of the five largest outbreaks of COVID-19 in the country

---

[18] Quoting Catherine E. Shoichet, Doctors Warn of "Tinderbox scenario" if Coronavirus Spreads in ICE Detention, CNN (Mar. 20, 2020), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html).

[19] NY Times, Coronavirus in the U.S.: Latest Map and Case Count, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20Stories&pgtype=Homepage&action=click&module=Spotlight&pgtype=Homepage#states. (Updated May 14, 2020 3:03 PM).

have been at correctional facilities.[20]  And, in spite of a low
testing rate in jails and prisons, the known infection rate is 2
½ times higher than in the general population.[21]  Over 70% of
tested inmates in federal prisons have COVID-19, "strongly
suggesting there are far more COVID-19 cases left uncovered."[22]

As of April 2, 2020, six ICE detainees and five ICE staff
at detention facilities had tested positive for COVID-19.  By
May 14, 2020, 943 detainees and 44 employees working in
detention facilities had tested positive.[23]  This includes one
detainee at the Bristol County House of Corrections in North
Dartmouth, Massachusetts and 2 detainees at the Wyatt Detention
Center in Central Falls, Rhode Island—two facilities that
regularly transfer detainees to SCHOC.[24]

---

[20] Id.

[21] Radley Balko, Stopping covid-10 behind bars was an
achievable moral imperative.  We failed.,
https://www.washingtonpost.com/opinions/2020/05/01/stopping-
covid-19-behind-bars-was-an-achievable-moral-imperative-we-
failed/ (published May 1, 2020).

[22] Michael Balsamo, Over 70% of tested inmates in federal
prisons have COVID-19, https://apnews.com/fb43e3ebc447355a4f71e
3563dbdca4f (published April 29, 2020).

[23] U.S. Immigration and Customs Enforcement, ICE Guidance on
COVID-19, https://www.ice.gov/coronavirus#tab1 (noting that
1,788 detainees had been tested) (last visited May 14, 2020).

[24] Id.

On March 23, the Centers for Disease Control and Prevention ("CDC") issued guidance for correctional facilities and detention centers. <u>See</u> Resp. Ex. 5, CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Interim Guidance") (Mar. 23, 2020).[25]   ICE has also issued a Pandemic Response plan that requires facilities housing immigration detainees to, among other standards, comply with the CDC's recommendations.  <u>See</u> Resp. Ex. 19, ICE, Enforcement and Removal Operations COVID-19 Pandemic Response Requirements ("ICE PRR") (Apr. 10, 2020).[26] These documents acknowledge the importance of social distancing in detention centers.  ICE represents that it is implementing testing, screening, use of personal protective equipment, and other measures in accordance with CDC guidelines.

III. <u>The SCHOC Facility</u>

It is against this troubling backdrop that petitioners have filed the instant suit.  The named petitioners and the members of the provisionally certified class are all civil immigration

---

[25] https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[26] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

detainees housed at SCHOC.[27]  SCHOC is a correctional facility
located in Dover, New Hampshire, which has an intergovernmental
service agreement with ICE to house civil immigration detainees.
Doc. no. 47 at 4 (Joint Statement of Facts).  The facility
houses individuals who have been arrested by ICE for civil
immigration offenses and acts as a staging facility before
deportation for civil immigration detainees from other
facilities in Massachusetts and Rhode Island.  Id. at 13.  As of
April 30, 2020, the inmate population at the facility was 320,
approximately 64% of its maximum 495-inmate capacity.  Id. at 4;
doc. no. 40.

At the May 1 hearing, Superintendent Brackett testified
that detainee class members are housed throughout seven of the
fourteen units at the SCHOC: units B, C, D, E, G, H, and J.
Doc. no. 47 at 13.  In general, civil detainees in these units
are mixed in with state and/or federal criminal defendants
awaiting trial, sentencing, or serving sentences.  Units B, C,
D, E, G, and H have similar layouts: detainees and prisoners
live two people to a cell and share an open common area and
showers.  The cells in these units are approximately 7 feet by
13 feet in size and contain metal bunk beds, a desk, a sink, and

---

[27] ICE released two of the named petitioners (Cuesta-Rojas
and Tacuri-Tacuri) on conditions.  See doc. no. 22.

a toilet.  See Resp. Ex. 16.  The bunk beds are affixed to the
wall of the cell and cannot be moved.  The top bunk is
approximately two or three feet above the bottom bunk.  Units G
and H are larger general population units, each with the
capacity to hold 72 inmates in 36 cells separated onto two
floors.

Unit J is set up differently than the other units.  It is a
"barracks" style unit with no cells and an open floor plan.
Detainees sleep in rows of freestanding bunk beds that are
divided between two floors.  Prior to April 23, the bunk beds in
Unit J were between two and four feet from one another.  As of
April 23, the bunk beds were moved to be six feet apart.  See
doc. no. 47 at 22; Resp. Exs. 11 & 14.  Unit J houses civil
immigration detainees on the second floor and criminal
defendants on the bottom floor.  There are approximately 12
bunkbeds on each floor and currently about 20 detainees on each
floor.  There is a common area shared by both floors of inmates
as well as common showers and restrooms.  See Resp. Ex. 12, 13,
& 15.


IV.  Current Conditions at SCHOC

There are currently no reported cases of detainees or staff
at SCHOC who have tested positive for COVID-19 but testing has

been limited.  Test results for the six staff members and seven inmates tested as of May 8 were negative.[28]

Over the last six weeks, SCHOC has instituted a variety of measures to prevent the introduction of COVID-19 into the facility by following, to the extent practicable, the recommendations contained in the ICE Enforcement and Removal guidelines and CDC guidance specific to correctional and detention facilities.  See Resp. Ex. 5 (CDC Interim Guidance) & 19 (ICE PRR).

To prevent the introduction of COVID-19, SCHOC has suspended all in-person inmate visitation privileges.  Clergy and attorneys, however, still conduct in-person visits.  Staff members must undergo screening before entering work each day and are required to wear gloves and a mask except when eating.

SCHOC has also taken steps to limit interaction between inmates at the jail.  SCHOC has instituted a lockdown policy which means inmates living in units with cells are locked inside their cells for 22 hours a day.  Given the size and layout of the individual cells on most of the units, detainees are within

---

[28] Several weeks ago, a local deputy sheriff who does contract work for SCHOC transporting inmates, tested positive for the virus.  At or around the time that the deputy sheriff tested positive he had had contact with three inmates.  Those inmates were never tested for COVID-19.  On May 8, the court learned that an inmate had been tested on May 7.  The "rapid" test was negative for COVID-19. (Doc. no. 79).

three feet of one another while sleeping and likely within six feet of one another during waking hours.

Inmates are released for "tier time" for two one-hour periods per day.  In the larger units, approximately 12 inmates are released at one time but there is sometimes overlap between groups when detainees are reluctant to return to their cells. Lockdown looks different on Unit J because of its barracks-style layout.  When one floor of Unit J is on lockdown, those detainees may not use the common area or showers and cannot interact with individuals on the other floor.  But they are not required to stay in their bunks and often interact with the other detainees housed on that floor.  When released for tier time, the detainees in the upper and lower floors are permitted to use the common areas at the same time.  When inmates are out for tier time, they may use the common areas to eat (if it coincides with mealtime), shower, recreate, use tablets, or do laundry.  They are not required to distance themselves from one another and often interact in close proximity.

Superintendent Brackett testified that he has directed inmates who are employed as cleaning staff to clean the common areas in between the release periods and to use CDC-approved disinfectant cleaning agents.  Based on several of the detainees' testimony, however, cleaning of common areas is not

occurring consistently between release periods and does not always involve disinfecting cleaning agents.  Mr. Rosales and Mr. Gomes testified that the common restrooms and showers are cleaned only once a day and have "dirty, filthy curtains" and mold.  Doc. no. 116 at page 69.

At mealtimes, detainees interact more closely with one another.  Some detainees work in the kitchen and interact with individuals from other units.  Detainees also deliver food to units.  Mr. Gomes testified that as of May 1, individuals transporting food did not wear masks or gloves.  And while detainees on lockdown during mealtime eat inside their cells, detainees on tier time during meals may eat close to one another in the common area.  In Unit J, detainees line up near one another to receive their meals from a food cart.

SCHOC has endeavored to make information about the virus and preventative measures available to detainees. Superintendent Brackett testified that every detainee has access to a tablet for recreational or educational use that contains a free health section with information in English and Spanish about COVID-19—how it spreads, symptoms of the virus, and some information about social distancing.  See Resp. Exs. 8-10.[29]

---

[29] These informational guides include some pictures as well as text, to aid in communicating the information to inmates who are not literate in English or Spanish.

Superintendent Brackett also testified that when the lockdown policy was first initiated, correctional officers visited each cell to explain that the lockdown was a precautionary measure related to the virus, not a disciplinary punishment.  More recently, SCHOC posted flyers in all units instructing the inmates to sleep in their bunk beds head to toe (with one inmate's head above the other inmate's feet) to keep 6 feet of separation while sleeping.  See Resp. Ex. 3.

Beginning on March 23, and every two weeks thereafter, medical personnel at SCHOC individually screened everyone at the facility to check for signs or symptoms of COVID-19 and allow inmates an opportunity to ask questions about the virus.

SCHOC has also strived to provide inmates with access to personal hygiene products, cleaning supplies, and personal protective equipment to the extent possible.  As of now, all inmates are issued a weekly personal hygiene kit that includes soap, shampoo, and deodorant and have access to cleaning supplies upon request.  If inmates live in units with laundry in the common areas, they can launder clothes and bedsheets as often as desired.  If laundry is not available to them in their unit, they can participate in the laundry exchange that occurs three times weekly.

SCHOC has recently made masks available to every inmate. Initially, SCHOC did not have enough masks to provide one to every detainee; however, SCHOC acquired 60,000 masks the week of April 27.  As of April 29 or 30, SCHOC issued every detainee and inmate a surgical mask made of 3-ply cloth.  Superintendent Brackett testified that detainees are encouraged to wear masks, but he does not mandate that all detainees wear masks.

SCHOC has also begun to implement more drastic quarantine measures for incoming inmates and those who have traveled outside the facility.  Beginning on April 25, all new inmates are booked and then quarantined for 14 days in either Unit F (for men) or Unit A (for women) before being transferred to one of the other housing units.  See Doc. no. 31 at 3. As of May 1, there were no new female inmates being quarantined in Unit A and there were 16 male inmates being quarantined in Unit F.  Unit F has 12 cells, each with a bunkbed, desk, sink, and toilet.  See Resp. Exs. 16 & 17.  There is also a common area with tables for eating or recreating and common showers and restrooms.  When possible, only one inmate is housed in each cell in Unit F; however, inmates are doubled up when necessary.  SCHOC tries to house inmates together who arrived at or around the same time and/or who were transported to the SCHOC from the same location. If an inmate leaves the facility for any reason, such as a

medical appointment, he is quarantined for 14 days upon his
return.  Doc. no. 40.

Unit F also houses the "airlift" civil immigration
detainees who are subject to final removal orders.  ICE brings
in these airlift detainees on Thursdays or Fridays from other
ICE detention facilities[30] and then sends them out on flights the
following Monday or Tuesday from the airport at Pease Air
National Guard Base in Portsmouth, New Hampshire.[31]  Because of
the short duration of their stay and their transitory character,
the airlift detainees stay quarantined in Unit F for their whole
stay.

Like detainees in other units, detainees in Unit F are kept
on lockdown in their cells for approximately 22 hours a day.
Detainees in Unit F are released one cell at a time for tier
time when they can engage in the same activities as described
above for the other units.  In between the sessions of tier

---

[30] Prior to May 1, detainees from Bristol and Wyatt were
brought to SCHOC prior to their deportation.  Doc. no. 47 at 13.
On May 1, Superintendent Brackett testified that moving forward,
detainees from facilities with known COVID cases, such as
Bristol and Wyatt, would be brought directly to Pease and would
not enter the SCHOC.

[31] Many of these detainees are transported to detention
centers in Louisiana before they are finally deported.  Doc. no.
47 at 24.  The virus has already infiltrated a number of these
facilities: out of 425 ICE detainees across five different
detention facilities, 80 had tested positive for the virus as of
April 29.   Doc. no. 47 at 24.

time, an inmate is tasked with cleaning the common areas before the next inmates are released.

SCHOC's efforts to prevent the introduction of the virus into SCHOC and combat its spread are not insignificant.  But the measures have not been implemented flawlessly.  And structural and operational issues make infection control practices challenging.  The facility is not completely isolated from outside sources of infection, some inmates may choose to disregard protective measures, those who want to distance themselves cannot due to the size and layout of cells, and alcohol-based hand-sanitizer is not available due to the possibility of intentional ingestion and misuse.  It is undisputed that it is virtually impossible under the current conditions for inmates to practice social distancing.  Doc. no. 47 at 15, 17, 19, 23.

According to Superintendent Brackett, staff are regularly moved from one unit to another for reasons having to do with "security."  Brackett confirmed that SCHOC policy regarding staff movement is "substantially unchanged between before and after the pandemic."  Doc. no. 116 at 30.  It appears SCHOC has made no effort to reduce the number of inmates each staff member is exposed to—a practice that directly contradicts both the CDC's Interim Guidance and the CDC Detention Report which

encourages facilities to "[a]ssign staff members to consistent
locations" in order to prevent introduction of COVID-19 into the
facility.  See Resp. Ex. 5; CDC Detention Report.  Assigning
staff to the same units would obviously help the SCHOC contain
the spread of the virus and better enable effective tracing and
isolation in the foreseeable event that a staff member were to
test positive.

There also appears to be a lack of effective education and
communication between SCHOC staff and detainees about the
available preventative measures.  For example, all three
detainees testified that they had received a mask but had not
been given any instruction on when or how to wear the mask and
did not know whether additional masks would be available.  None
of the detainees were wearing masks during their testimony and
all testified that by and large none of the inmates or detainees
were wearing masks on a regular basis.  Similarly, regarding the
head-to-toe flyers, both Mr. Gomes and Mr. Chavez testified that
the flyers went up without explanation and they were never told
why they should follow that guidance.  There also appears to be
a lack of education about how to learn more about the virus.
Although Superintendent Brackett testified credibly that
information about COVID-19 is available on the inmates' tablets,
detainees testified that they were not aware that there was any

COVID-19 related information available on the tablets.
Accordingly, it is unclear whether the detainees fail to
maintain social distance in spaces where they can by choice or
due to a lack of education about the need for social distancing
and the dangers of the virus.

Most importantly, there is no evidence that SCHOC is taking
special precautions regarding detainees who are particularly
vulnerable to COVID-19 due to underlying medical conditions.
Superintendent Brackett testified that detainees with chronic
illnesses are monitored by a chronic care nurse and a
supervising physician (who is not on site) and that the facility
has a contract with a local hospital for when emergency or
critical care is needed.  During the May 1 hearing,
Superintendent Brackett's testimony suggested that SCHOC had yet
to review detainee medical files to identify detainees at higher
risk from COVID-19.  At the end of the hearing, counsel for the
respondents represented that Superintendent Brackett planned to
think about additional steps he could take to provide greater
protection to medically vulnerable individuals.  On May 4,
counsel for respondents informed the court that SCHOC had
reviewed detainee files but determined that no detainees had
medical conditions that put them at high-risk.  There is no
evidence that SCHOC has made any effort to isolate vulnerable

detainees or provide them with extra personal protective
equipment or cleaning supplies.

**LEGAL STANDARD**

"[A] district court entertaining a petition for habeas
corpus has inherent power to release the petitioner pending
determination of the merits." Woodcock v. Donnelly, 470 F.2d
93, 94 (1st Cir. 1972) (per curiam); see also Mapp, 241 F.3d at
230.  In the First Circuit, a court may grant bail to a habeas
petitioner if: (1) the petitioner has a clear case on the law
and facts, or (2) exceptional circumstances are present and the
petitioner demonstrates a substantial claim of constitutional
error.  Glynn, 470 F.2d at 98; Bader, 2003 WL 163171, at *4.  As
the court held in a previous order (doc. no. 34), the latter
test applies in this case because the COVID-19 pandemic presents
an exceptional health risk to detainees.  Therefore, a
petitioner is entitled to a bail hearing if he demonstrates a
"substantial claim of constitutional error," and that
"extraordinary circumstances exist that make the grant of bail
necessary to make the habeas remedy effective."   Doc. no. 34
(citing Mapp, 241 F.3d 230).

A habeas petitioner demonstrates that he has a substantial
claim of constitutional error by showing he is likely to succeed

on the merits of his habeas petition.  See, e.g., Leslie v.
Holder, 865 F. Supp. 2d 627, 639 (M.D. Pa. 2012) (internal
quotation marks omitted) (to be released on bail pending a
merits determination, the habeas petition must "present merits
that are more than slightly in petitioner's favor"); Mapp, 241
F.3d at 230 (substantial claim raised where petitioner
challenged a deportation order "the propriety of which is
clearly open to question").  At the bail hearing, respondents
have the burden to prove by clear and convincing evidence that
the petitioner is either a danger to the public or a flight
risk.  See Hernandez-Lara v. Immigration & Customs Enf't, Acting
Dir., No. 19-CV-394-LM, 2019 WL 3340697, at *7 (D.N.H. July 25,
2019).  If the court grants bail, the court imposes appropriate
requirements and safeguards.

## ANALYSIS

Petitioners allege respondents are violating their due
process rights under the Fifth Amendment to the United States
Constitution by detaining them in conditions that put them at
substantial risk of harm due to COVID-19.  Doc. no. 5 at ¶¶ 73,
90.  The Due Process Clause of the Fifth Amendment forbids the
government from depriving a person of life, liberty, or property
without due process of law.  U.S. Const. amend. V.  The

26

protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

Constitutional protections for individuals confined by the state, whether civilly or criminally, include the right to reasonable safety and medical care.  See Estelle v. Gamble, 429 U.S. 97, 103 (1976); see also Youngberg v. Romeo, 457 U.S. 307, 315 (1982) ("[T]he right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." (citation omitted)).  "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989).  The State's duty to protect arises "from the limitation which it has imposed on [the detainee's] freedom to act on his own behalf."  Id.; see also Estelle, 429 U.S. at 103 ("An inmate must rely on prison

authorities to treat his medical needs; if the authorities fail
to do so, those needs will not be met.").

The duties owed under the Due Process Clause to those who
are detained civilly are at least as extensive as those owed
under the Eighth Amendment to convicted inmates.  "If it is
cruel and unusual punishment to hold convicted criminals in
unsafe conditions, it must be unconstitutional to confine [civil
detainees]—who may not be punished at all—in unsafe
conditions." Youngberg, 457 U.S. at 315; see also Bell v.
Wolfish, 441 U.S. 520, 545 (1979) (pretrial detainees "retain at
least those constitutional rights that . . . are enjoyed by
convicted prisoners").  Individuals who have been civilly
detained "are entitled to more considerate treatment and
conditions of confinement than criminals whose conditions of
confinement are designed to punish." Youngberg, 457 U.S. at
321-22.

Neither the Supreme Court, nor the First Circuit, has
explicitly plotted the boundaries of the government's duty to
protect the health and safety of civil detainees. See Miranda-
Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016).
However, it is clear the duty "extend[s] at least as far as the
protection that the Eighth Amendment gives to a convicted

prisoner." Id. (internal quotation marks omitted and emphasis added).

A prison official violates the Eighth Amendment if (1) the alleged deprivation of medical care is objectively "sufficiently serious"; and 2) the prison official has a "sufficiently culpable state of mind" that shows "deliberate indifference to inmate health or safety." Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018) (internal quotation marks omitted); see also Farmer v. Brennan, 511 U.S. 825, 834 (1994).  An act or omission resulting in the denial of "'the minimal civilized measure of life's necessities'" satisfies the objective component of that test under the Eighth Amendment. Farmer, 511 U.S. at 834 (citations omitted).  The objective component may be established by allegations regarding an unmet serious medical need "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Miranda-Rivera, 813 F.3d at 74.

The Eighth Amendment protects an inmate from being held in conditions that cause both current and future harm. Helling v. McKinney, 509 U.S. 25, 33 (1993).  Accordingly, an inmate could "successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery" and a prison

official may not be "deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." Id. The Constitution offers a remedy even if an inmate does not allege "that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." Id. (observing "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); see also Hutto v. Finney, 437 U.S. 678, 682 (1978).

With respect to the subjective component of the Eighth Amendment standard, a defendant is deliberately indifferent if he subjectively "knows of and disregards an excessive risk to inmate health or safety." Leite, 911 F.3d at 52 (internal quotation marks omitted). To show the defendant had a culpable state of mind, the plaintiff "must provide evidence that the defendant had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." Id. (internal quotation marks omitted). "Deliberate indifference entails something more than mere negligence, but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge

that harm will result." Id. (internal quotation marks and brackets omitted). "'[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'" Kingsley v. Hendrickson, 576 U.S. 389, ___, 135 S. Ct. 2466, 2472, (2015) (citation omitted).

In Kingsley, the United States Supreme Court considered the circumstances and sources of rights of pre-trial and post-conviction detainees in contrasting the "requisite state of mind" for their excessive force claims. Id. To establish a violation of the Cruel and Unusual Punishment Clause, a convicted inmate must show that a use of force was applied "maliciously and sadistically to cause harm," and not "in a good-faith effort to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320-21 (1986). The Court in Kingsley, 135 S. Ct. at 2475, held that a pre-trial detainee asserting a claim under the Fourteenth Amendment need only show that the "force purposely or knowingly used against him was objectively unreasonable." Id. at 2473. Factors influencing the Court's decision included the different language of the two Clauses and the "most important[]" fact that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" Id.

The Supreme Court has not issued any decision since
Kingsley directly addressing whether the purposeful or knowing,
objective unreasonableness standard applied in Kingsley also
applies to claims brought by pretrial detainees about government
acts or omissions that deny them medical care or expose them to
substantial health and safety risks.  There is a circuit split
on that question.[32]  See Estate of Vallina v. Cty. of Teller
Sheriff's Office, 757 F. App'x 643, 646 (10th Cir. 2018) (noting
that Second, Seventh, and Ninth Circuits have "adopted an
objective test" requiring "reckless disregard," while the Fifth,
Eighth, and Eleventh Circuits have held that Kingsley does not
extend to detainee medical care claims); see also Banks v.
Booth, No. CV 20-849(CKK), 2020 WL 1914896, at *6 (D.D.C. Apr.

---

[32] Compare Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir.
2018); Darnell v. Pineiro, 849 F.3d 17, 34-35 (2d Cir. 2017);
Castro v. Cty. of L.A., 833 F.3d 1060, 1071 (9th Cir. 2016) (en
banc), with Whitney v. City of St. Louis, 887 F.3d 857, 860 n.4
(8th Cir. 2018); Dang ex rel. Dang v. Sheriff, Seminole Cty.,
871 F.3d 1272, 1279 n.2 (11th Cir. 2017); Alderson v. Concordia
Par. Corr. Facility, 848 F.3d 415, 420 (5th Cir. 2017)
(following circuit precedent).  See also See also McCowan v.
Morales, 945 F.3d 1276, 1291 (10th Cir. 2019) (declining to
decide whether Kingsley has "eliminated the subjective inquiry
previously applicable to deliberate indifference claims brought
by pretrial detainees," while noting that the "very terminology"
of deliberate indifference "seems to require both a subjective
and an objective test").  But see Richmond v. Huq, 885 F.3d 928,
938 n.3 (6th Cir. 2018) (there is "serious doubt," post-
Kingsley, whether plaintiff "need even show that the individual
defendant-officials were subjectively aware of her serious
medical conditions and nonetheless wantonly disregarded them").

19, 2020) (concluding, based "on the pertinent reasoning of
Kingsley and the persuasive authority of other courts" that pre-
trial detainees "do not need to show deliberate indifference in
order to state a due process claim for inadequate conditions of
confinement").

Nearly all of the First Circuit cases that have looked to
the Eighth Amendment for guidance in evaluating pretrial
detainee due process deliberate indifference claims predate
Kingsley.  See, e.g., Ruiz-Rosa v. Rullan, 485 F.3d 150, 155
(1st Cir. 2007) (citing City of Revere v. Mass. Gen. Hosp., 463
U.S. 239, 244 (1983)); Gaudreault v. Mun'y of Salem, 923 F.2d
203, 208 (1st Cir. 1990) (same).  Only twice since Kingsley has
the First Circuit issued an opinion concerning a pretrial
detainee medical care claim, and in both cases, the court
applied the Eighth Amendment standard.  See Zingg v. Groblewski,
907 F.3d 630, 634-35 (1st Cir. 2018); Miranda-Rivera, 813 F.3d
at 74.  But the First Circuit's approach to the deliberate
indifference claims in those cases does not appear to foreclose
a ruling that Kingsley has changed the standard.  See Zingg, 907
F.3d at 637 (applying deliberate indifference standard to
pretrial detainee plaintiff's "Eighth Amendment claim" without
addressing whether analysis or result would have been different
if that claim had been litigated as "due process" claim);

Miranda-Rivera, 813 F.3d at 74 (evidence of officer's deliberate
indifference, sufficient to satisfy Eighth Amendment, also
satisfies mens rea and "'conscience shocking'" elements of
substantive due process violation (citations omitted)).

In the absence of binding, post-Kingsley authority,
district courts within the First Circuit do not agree whether
the subjective prong of a deliberate indifference claim still
applies to due process claims brought by civil detainees.  Some
courts have continued to analyze deliberate indifference claims
without considering whether Kingsley altered the applicable
standard.  See Henry v. Hodoson, No. 16-CV-11606-RGS, 2018 WL
6045250, at *4 (D. Mass. Nov. 19, 2018).  One court reasoned
there was "much to be said" for extending Kingsley to pretrial
detainee due process claims but declined to do so given pre-
Kingsley First Circuit precedent[33] and the fact that "whether
Kingsley will ultimately be extended by the First Circuit to
encompass conditions of confinement claims has no bearing on the

---

[33] See Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir. 2005)
(applying Eighth Amendment standard to pretrial detainee's
claims, after noting that "the parameters" of the liberty
interests implicated by pretrial detainee's conditions of
confinement claims "are coextensive with those of the Eighth
Amendment's prohibition against cruel and unusual punishment");
Burrell v. Hampshire Cty., 307 F.3d 1, 7 (1st Cir. 2002)
("Pretrial detainees are protected under the Fourteenth
Amendment Due Process Clause . . . ; however, the standard to be
applied is the same as that used in Eighth Amendment cases.")

outcome." See Couchon v. Cousins, No. CV 17-10965-RGS, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018); see also Savino v. Souza, No. CV 20-10617-WGY, 2020 WL 2404923, at *8 (D. Mass. May 12, 2020) ("Savino II") (acknowledging other circuits had adopted an objective due process test for civil detainees after Kingsley but applying the traditional Eighth Amendment test in light of post-Kingsley First Circuit precedent and finding detainees likely to succeed under the more demanding test). Magistrate Judge Nivison has consistently held that post-Kingsley, an objective standard is sufficient to establish defendant liability for deliberate indifference claims brought by pretrial detainees. See, e.g., Salcedo v. King, No. 2:18-CV-00092-DBH, 2018 WL 1737941, at *2 (D. Me. Apr. 11, 2018) ("a condition of confinement claim against a particular individual defendant often will include an additional, subjective component (proof of deliberate indifference) in order to establish that particular defendant's liability," but "where the conduct in question is 'purposefully or knowingly' applied, satisfaction of an objective standard is sufficient to establish liability" (citing Kingsley, 135 S. Ct. at 2472)), R&R adopted, No. 2:18-CV-92-DBH, 2018 WL 2123610 (D. Me. May 8, 2018), and Dixon v. Groeger, No. 2:16-CV-00178-NT, 2017 WL 3298675, at *3 (D. Me.

Aug. 2, 2017) (same), R&R adopted, No. 2:16-CV-178-NT, 2017 WL
5973367 (D. Me. Dec. 1, 2017).

Most recently, in a case in which three ICE detainees at
Wyatt Detention Center brought habeas corpus petitions alleging
that their conditions of confinement violated their due process
rights, Judge Smith accepted both parties' agreement that
"objective unreasonableness" was the appropriate post-Kingsley
standard and analyzed the case through an "objective
unreasonableness prism." Medeiros v. Martin, No. CV 20-178 WES,
2020 WL 2104897, at *4, n.1 (D.R.I. May 1, 2020).

Based on the pertinent reasoning of Kingsley and the
persuasive authority of other courts, it is likely that civil
detainees no longer need to show subjective deliberate
indifference in order to state a due process claim for
inadequate conditions of confinement.  However, whether the
court analyzes petitioners' due process claim through a
traditional Eighth Amendment deliberate indifference standard—
which includes a subjective prong—or interprets Kingsley as
having altered the standard, the result is the same.  Detainees
who have medical conditions that place them at higher risk for
serious illness from exposure to COVID-19 have demonstrated that
they are likely to succeed on the merits of their due process
claim.  It is a close call whether lower-risk detainees are

likely to succeed under either standard given the lack of COVID-19 at the facility and the steps SCHOC has taken to reduce the risk.  Therefore, because the outcome is the same under either standard, at this preliminary phase of the case, the court declines to resolve whether Kingsley changed the applicable standard for due process claims brought by civil detainees.

I.   Detainees with high-risk conditions

It cannot be disputed that COVID-19 poses an objectively serious health risk to detainees whose age or health conditions place them at higher risk for serious illness or death.  As already stated in the court's May 4, 2020 order, (doc. no. 52) both the CDC and ICE recognize that certain categories of individuals are at "higher-risk for serious illness from COVID-19."  CDC Higher Risk; Resp. Ex. 19.

The ICE PRR states that detention facilities "must" identify detainees who meet the "CDC's identified populations potentially being at higher-risk for serious illness from COVID-19."  Resp. Ex. 19.[34]   The ICE PPR incorporates an April 4 e-mail from Peter Berg, an Assistant Director of ERO Field

---

[34] The ICE PRR also requires detention facilities to notify the local ERO Field Office Director and Field Medical Coordinator "as soon as practicable, but in no case more than 12 hours" after identifying a high-risk detainee using the subject line "Notification of COVID-19 High Risk Detainee."

Operations informing Field Office Directors that the ERO had

expanded on the CDC's high-risk categories.  Resp. Ex. 19, ICE

PRR Attachment K ("ERO Directive").  The e-mail directs Field

Office Directors to identify detainees with the following

conditions as "potentially being at higher risk for COVID-19":

- Pregnant detainees or those having delivered in the last
  two weeks
- Detainees over 60 years old
- Detainees of any age having chronic illnesses which would
  make them immune-compromised, <u>including</u> <u>but</u> <u>not</u> <u>limited</u> <u>to</u>:
  - Blood Disorders
  - Chronic Kidney Disease
  - Compromised immune system (e.g., ongoing treatment
    such as chemotherapy or radiation, received an organ
    or bone marrow transplant, taking high doses of
    corticosteroids or other immunosuppressant
    medications)
  - Endocrine disorders
  - Metabolic disorders
  - Heart disease
  - Lung disease
  - Neurological and neurologic and neurodevelopment
    conditions

<u>Id.</u> (emphasis added).  The ERO Directive states that Field

Office Directors should identify high-risk cases and review them

"to determine whether continued detention remains appropriate in

light of the COVID-19 pandemic."  <u>Id.</u>  The directive states that

the "presence of one of the factors listed above should be

considered a <u>significant</u> <u>discretionary</u> <u>factor</u> weighing in favor

of release."  <u>Id.</u> (emphasis added).

In light of ERO's Directive, the CDC Higher Risk guidance,

and a weight of authority from courts throughout the country,

the court concludes that COVID-19 poses an objectively serious
health risk for detainees with high-risk conditions.  See, e.g.,
Frazier v. Kelley, No. 4:20-CV-00434-K, 2020 WL 2110896, at *6
(E.D. Ark. May 4, 2020); Coreas v. Bounds, No. CV TDC-20-0780,
2020 WL 1663133, at *9 (D. Md. Apr. 3, 2020).

As to the subjective prong, it is undisputed that
respondents received the ERO's PRR and CDC guidance and were
aware of its requirements.  Superintendent Brackett testified
that he received the ICE PRR on April 10 and reviews it "very
often."  Doc. no. 115 at 96-97.  He also testified that he
considers CDC guidance about management of COVID-19 in
correctional and detention facilities to be "his Bible" and that
he reviews it daily.  The CDC guidance states in multiple places
that special accommodations should be taken for individuals who
"are at higher risk of severe illness from COVID-19" and
provides links to the list of CDC high-risk categories
throughout.  Resp. Ex. 5, CDC Interim Guidance, at 3, 16, 20,
and 23.  Therefore, there is no dispute that respondents had
actual knowledge that COVID-19 presents a substantial risk of
serious harm to high-risk detainees.  The question is whether
respondents acted or failed to act in a manner that manifests
deliberate indifference by disregarding the risk and "failing to
take reasonable measures to abate it."  Farmer, 511 U.S. at 847.

Respondents failed to act.  As of May 1, almost a month after the April 4 ERO e-mail, respondents had yet to identify any high-risk detainees.  At a May 4 hearing, respondents' counsel represented that SCHOC had conducted a review of detainee cases but reached the dubious conclusion that no detainees fell within a high-risk category.  Yet, when pressed, counsel conceded that one detainee was over 65 and a "handful" were over 60; therefore, SCHOC should have immediately been able to classify these detainees as high-risk pursuant to CDC and ERO guidance.  Respondents have put forward no evidence or explanation for this failure to identify obvious high-risk cases.  And it has been demonstrated that this review and identification can be completed expeditiously.  After petitioners received medical records disclosed to them in this case pursuant to an April 24, 2020 protective order, see doc. no. 33, they identified 19 detainees whose medical records document high-risk conditions — a task they appear to have completed over one weekend.  See Doc. no. 52.  And when respondents' own medical expert reviewed that list, he characterized one detainee had become a "ticking time bomb" after he stopped taking his medication.  See id.  Respondents released the detainee described as a "ticking time bomb," and agreed to release an additional detainee on conditions, but

argued that none of the remaining 17 detainees on petitioners' list should be classified as high-risk, not even the detainees whose advanced age plainly put them in the high-risk category.

The court is deeply troubled by respondents' failure to identify high-risk detainees until forced to do so by this lawsuit.  It was only after the court ordered bail hearings for high-risk detainees, and petitioners reviewed detainee medical files and put 19 of them on a high-risk list, that respondents even became aware of the "ticking time bomb" in their midst.

To this point, there remains no evidence that respondents have conducted or will conduct their own review of all current or incoming detainees to identify high-risk cases and reassess custody as directed by the ERO.  Nor is there any evidence that SCHOC has taken steps to alleviate the known substantial risk that COVID-19 presents to individuals who fall within high-risk categories due to their age or medical conditions.  For example, there is no evidence that petitioners have treated all incoming detainees as if they were at a heightened risk of serious COVID-19 complications, until triaged as to their risk level.  And there is no evidence that SCHOC is implementing or will implement additional measures to protect the now known high-risk detainees who remain in SCHOC custody.

To be sure, the record demonstrates that respondents have
taken measures to reduce the risk of COVID-19's introduction and
transmission at the SCHOC, steps that this court commended in
its May 1 ruling from the bench and in written orders in this
case.  However, these measures still do not allow vulnerable
inmates to socially distance and "do nothing to alleviate the
specific, serious, and unmet medical needs" of high-risk
detainees.  Coronel v. Decker, No. 20-CV-2472 (AJN), 2020 WL
1487274, at *5 (S.D.N.Y. Mar. 27, 2020) (emphasis in original)
(finding high-risk detainees likely to succeed in deliberate
indifference claim because government had taken no preventative
action to protect "especially vulnerable detainees").[35]

Therefore, as previously stated during the May 1 hearing
and in the May 4 order (doc. no. 52), the court concludes that
detainees who have medical conditions which place them at high-
risk for severe illness from COVID-19 have demonstrated a
likelihood of success on their due process deliberate

---

[35] The court notes that the issue in this case is far
narrower than the issue in Money v. Pritzker, No. 20-CV-2093,
2020 WL 1820660, at *18 (N.D. Ill. Apr. 10, 2020).  In Money,
there was evidence that state correctional facility officials
had developed and were implementing a plan for "individualized
decisions on release through a panoply of vehicles guided by
administrative discretion."  Id.  Here, by contrast, respondents
failed to take any steps to identify and implement additional
measures to protect those at highest risk in their custody.

indifference claim.  In so holding, the court joins many courts that have found high-risk inmates are likely to prevail on their due process deliberate indifference claims under either a traditional Eighth Amendment analysis or a deliberate indifference analysis that applied a standard satisfied by proof of mens rea short of subjective knowledge.  See, e.g., DIANTHE MARTINEZ-BROOKS et al., Plaintiffs, v. D. EASTER & MICHAEL CARVAJAL, Defendants., No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *22 (D. Conn. May 12, 2020) (finding inmates likely to succeed under Eighth Amendment deliberate indifference standard because facility had failed to transfer medically vulnerable inmates to home confinement in meaningful numbers and social distancing remained impossible); Savino II, 2020 WL 2404923, at *7-*10 (concluding detainees were likely to succeed under Eighth Amendment standard because government had "steadfastly objected" to releasing detainees on bail; suggested social distancing was unnecessary; and their prevention strategy lacked testing and contact tracing); Carranza v. Reams, No. 20-CV-00977-PAB, 2020 WL 2320174, at *10 (D. Colo. May 11, 2020) (finding high-risk inmates likely to succeed under Eighth Amendment deliberate indifference standard when defendant knew high-risk inmates were vulnerable to COVID-19 but did not order medical staff to identify vulnerable inmates and mitigation efforts with regard

to high-risk inmates were not reasonable); <u>Fraihat v. ICE</u>, No. EDCV191546JGBSHKX, 2020 WL 1932570, at *24 (C.D. Cal. Apr. 20, 2020) (concluding ICE detainees were likely to succeed in their deliberate indifference claim under post-<u>Kingsley</u> recklessness standard due to facilities' "month-long failure to quickly identify individuals most at risk of COVID-19 complications and require specific protection"); Banks, 2020 WL 1914896, at *11 (finding likelihood of success under both the Eighth Amendment and post-<u>Kingsley</u> standards); Fofana v. Albence, No. 20-10869, 2020 WL 1873307, at *8 (E.D. Mich. Apr. 15, 2020) (finding high-risk ICE detainee had satisfied the subjective prong of the Eighth Amendment deliberate indifference standard); Savino I, 2020 WL 1703844, at *7 (ordering bail hearings for both high- and lower-risk ICE detainees); Coronel, 2020 WL 1487274, at *5-*6 (finding government's failure to take any action to protect high-risk inmates was "insufficient to satisfy Constitutional obligations").

    Having held that high-risk petitioners are likely to succeed on the merits of their deliberate indifference claim, the court concludes that the risk that COVID-19 presents to high-risk detainees is an extraordinary circumstance that justifies a bail hearing. "Severe health issues have been the prototypical but rare case of extraordinary circumstances that justify

44

release pending adjudication of habeas." Coronel, 2020 WL 1487274, at *9 (collecting cases).  If Petitioners whose medical conditions place them at a higher risk of severe illness, or death, from COVID-19 remain detained, they face a significant risk that they would contract COVID-19—the very outcome they seek to avoid. Release is therefore necessary to make the habeas remedy effective. See Barbecho v. Decker, No. 20-CV-2821 (AJN), 2020 WL 1876328, at *8 (S.D.N.Y. Apr. 15, 2020); see also Calderon Jimenez v. Wolf, No. 18-cv-10225 (MLW), Dkt. No. 507-1, at 3-4 (D. Mass. Mar. 26, 2020) (granting release pending a merits determination where the risk of a COVID-19 outbreak in the relevant prison constituted an extraordinary circumstance). Accordingly, the court began conducting bail hearings for high-risk detainees on May 4, 2020 and those hearings are ongoing.

During the course of these bail hearings, the court learned that SCHOC's review of detainee medical files had failed to identify high-risk detainees with conditions including asthma, COPD, obesity, hypertension, heart palpitations, diabetes, poorly healed gunshot wounds, and myasthenia gravis.  The court also learned that respondents were interpreting CDC and ERO guidance through a troubling, narrow, and mechanistic lens.

For example, in spite of a notation on one detainees' SCHOC medical record that hypertension is a "silent killer,"

respondents asserted at the bail hearings that detainees with

hypertension are not "high-risk" because hypertension is not

explicitly included within the CDC's definition of "serious

heart conditions."[36]   See CDC Higher Risk.[37]   They also contend

that the ERO does not recognize hypertension as a high-risk

condition, even though it explicitly "expand[s]" on the CDC

list—for example by setting the high-risk age as 60 instead of

65—and states that detainees with "heart disease" as opposed to

the CDC's "serious heart conditions" are high-risk.   ERO

Directive; Resp. Ex. 19.   Respondents argue that even though

hypertension is a form of "heart disease," it is not a "chronic

illness which would make [a detainee] immune-compromised";

therefore, a detainee with hypertension is not high-risk.   Id.

Respondents appear to base their assertions about hypertension

---

[36] This same detainee's medical records indicated that the
SCHOC nurse considered him a "high risk for cardiac
complication/hypertension due to age, gender, race and history."
The nurse also noted that he "has had heart surgery in the past
and he experiences palpitations on a regular basis."
Respondents ultimately chose not to contest that the detainee
was high risk on account of the detainee's heart palpitations.
But respondents reiterated at the hearing that, in their view,
the detainee's hypertension did not make him high-risk.   The
court is troubled by respondents' failure to recognize that
comorbidities work in concert to render certain individuals more
vulnerable to complications from COVID-19.

[37] The CDC Higher Risk website states "serious heart
conditions" include "heart failures, coronary artery disease,
congenital heart disease, cardiomyopathies, and pulmonary
hypertension."

on the opinion of a family medicine physician assistant; they

provide no evidence from cardiologists, COVID-19 specialists, or

medical journals.

Meanwhile, multiple medical studies confirm that

hypertension is associated with increased mortality from COVID-

19.[38]  And an initial review of COVID-19 deaths in New York State

showed that hypertension was the leading comorbidity: 55.4% of

the people who died with COVID-19 had hypertension.[39]

At this time, the relationship between hypertension and

elevated risk from COVID-19 appears not to be fully understood—

---

[38] See, e.g., Kearney PM, Whelton M, Reynolds K, et al.
Global burden of hypertension: analysis of worldwide
data. Lancet 2005; 365 (9455):217-2 (finding that COVID had "an
overall case fatality rate of 2.3 % (1,023 of 44,672 confirmed
cases), but 6.0% for people with hypertension"); American
College of Cardiology, COVID-19 Clinical Guidance for the
Cardiovascular Care Team, (https://www.acc.org/~/media/Non-
Clinical/Files-PDFs-Excel-MS-Word-etc/2020/02/S20028-ACC-
Clinical-Bulletin-Coronavirus.pdf),  March 6, 2020 (observing
that case fatality rates for comorbid patents such at
hypertension are materially higher than the average population);
Report of the WHO-China Joint Mission on Coronavirus Disease
2019 (COVID-19), World Health Organization (Feb. 24, 2020), at
12, https://www.who.int/docs/default-source/coronaviruse/who-
china-joint-mission-on-covid-19-final-report.pdf. (finding that
"[i]ndividuals at highest risk for severe disease and death
include people ... with underlying conditions such as
hypertension [and] diabetes").

[39] Richard Franki, Comorbidities the rule in New York's
COVID-19 deaths, https://www.the-hospitalist.org/hospitalist/
article/220457/coronavirus-updates/comorbidities-rule-new-yorks-
covid-19-deaths (published April 8, 2020) (observing the
prevalence of high blood pressures  in the overall adult
population is estimated at 45%).

some experts say that high blood pressure alone is not a risk factor, but that it may be a risk factor when combined with another underlying health condition.[40]  Other experts believe that COVID-19 strains the heart, making people with hypertension more vulnerable to the disease.[41]

However, as the CDC website explicitly recognizes, "COVID-19 is a new disease and there is limited information regarding risk factors for severe disease."  CDC Higher Risk.  And the ERO Directive stated that it was "expanding" on the CDC high-risk categories and that its bulleted list of high risk conditions was nonexclusive.  Resp. Ex. 19; ERO Directive.  Against this medical backdrop, and with due consideration for the heightened danger COVID-19 presents within detention facilities, numerous courts have recognized that hypertension is an objectively

---

[40] See Ernesto L Schiffrin, et al, Hypertension and COVID-19, American Journal of Hypertension, Volume 33, Issue 5, May 2020, Pages 373–374, https://doi.org/10.1093/ajh/hpaa057 (published April 6, 2020); Rob Stein, High Blood Pressure Not Seen As Major Independent Risk For COVID-19, National Public Radio (Mar. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/20/818986656/high-blood-pressure-not-seen-as-major-independent-risk-for-covid-19.

[41] See Anna Medaris Miller et al., 10 common health conditions that may increase risk of death from the coronavirus, including diabetes and heart disease, Business Insider, (Mar. 23, 2020), https://www.businessinsider.com/hypertension-diabetes-conditions-that-make-coronavirus-more-deadly-2020-3 (noting that 76% of people in Italy who died from COVID-19 had hypertension).

serious medical condition that places individuals at a "high probability of developing severe disease from COVID-19." Kevin M.A. v. Decker , No. CV 20-4593 (KM), 2020 WL 2092791, at *3 (D.N.J. May 1, 2020), see also, e.g., Coreas, 2020 WL 1663133, at *11; United States v. Rodriguez, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020). But see Betancourt Barco v. Price, No. 2:20-CV-350-WJ-CG, 2020 WL 2099890, at *8 (D.N.M. May 1, 2020) (concluding that hypertension does not make a detainee medically vulnerable to COVID-19).

The court has indicated in oral and written orders that it finds that hypertension is a condition that places individuals at higher-risk for severe disease and death from COVID-19. Without court intervention, however, respondents would have continued to give hypertension no weight in a high-risk analysis. "Where elasticity is vital, they are rigid; where life hangs upon a carefully drawn line, they opt for near-blanket incarceration. That is evidence of deliberate indifference." Savino II, 2020 WL 2404923, at *9. Respondents' steadfast commitment to an exceedingly narrow interpretation of detainee medical records in the context of this habeas litigation, a case about alleged deliberate indifference to medical needs, is disturbing.

II.  Detainees who do not have high-risk conditions

The CDC, ERO, and other courts have recognized that COVID-19 presents a substantial risk of harm to all persons, and not just to detainees with higher-risk conditions.  See, e.g., Zepeda Rivas v. Jennings, No. 20-CV-02731-VC, 2020 WL 2059848, at *1 (N.D. Cal. Apr. 29, 2020); Sallaj v. U.S. Immigration & Customs Enf't ("ICE"), No. CV 20-167-JJM-LDA, 2020 WL 1975819, at *3 (D.R.I. Apr. 24, 2020); Savino I, 2020 WL 1703844, at *7; Savino II, 2020 WL 2404923, at *7.  Although "the harm of a COVID-19 infection will generally be more serious for some petitioners than for others" it "cannot be denied that the virus is gravely dangerous to all of us."  Savino, 2020 WL 1703844, at *7.  Recent data support this conclusion.  A study from the CDC showed that even in patients between ages 19-64 with no underlying health conditions, the total hospitalization rate was 8-8.7%.[42]  In a different CDC study of hospitalized COVID-19 patients, 26% had no high-risk factors—of that subpopulation, 23% received ICU care and 5% died.[43]

---

[42] Nancy Chow et al., CDC, COVID-19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020, 69 Morbidity & Mortality Weekly Report 382, 382-84 (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.

[43] JA Gold et al., CDC, Characteristics and Clinical Outcomes of Adult Patients Hospitalized with COVID-19 — Georgia,

The virus certainly threatens us all, but detainees in prison facilities face even greater risks of catching COVID-19; as of May 14, four of the five largest outbreaks of COVID-19 in the United States were in detention facilities.[44]  Courts around the country acknowledge this fact.  See, e.g., Bent v. Barr, No. 19-CV-06123-DMR, 2020 WL 1812850, at *4 (N.D. Cal. Apr. 9, 2020); Basank, 2020 WL 1481503, at *3 ("[t]he nature of detention facilities makes exposure and spread of the virus particularly harmful."); Castillo v. Barr, No. CV2000605TJHAFMX, 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) ("[T]he Government cannot deny the fact that the risk of infection in immigration detention facilities – and jails – is particularly high if an asymptomatic guard, or other employee, enters a facility."); Coreas, 2020 WL 1663133, at *6 (finding it implausible that "someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty").

---

March 2020. 69 Morbidity & Mortality Weekly Report 545, 545-50 (May 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6918e1-H.pdf.

[44] NY Times, Coronavirus in the U.S.: Latest Map and Case Count, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20Stories&pgtype=Homepage&action=click&module=Spotlight&pgtype=Homepage#states. (Updated May 14, 2020 3:03PM).

The SCHOC has not eliminated many of these risks.  The
conditions of confinement do not allow for social distancing
within cells, inmates interact in common spaces, employees move
throughout the facility working on multiple units, and attorneys
and clergy continue to enter the facility without established
social distancing procedures.  Moreover, inmates are not
required to follow recommendations about masks and social
distancing in common spaces.  In sum, there are many vectors and
paths through which COVID-19 could be introduced and spread
quickly through the facility.

COVID-19 is highly contagious, and detainees live in close
quarters; therefore, their chances of infection are higher if
COVID-19 is introduced at SCHOC.  Once infected, as Judge Young
recently recognized in Savino, "taking hospitalization as a
marker of 'serious harm,' it is apparent that even the young and
otherwise healthy detainees face a 'substantial risk' (between
five and ten percent) of such harm." 2020 WL 1703844, at *7.
Accordingly, the court concludes that even detainees who do not
have a condition that places them at heightened risk of COVID-19
complications or death would likely be able to demonstrate that
detention at SCHOC places them at a "substantial risk of serious
harm." Coscia, 659 F.3d at 39.

Under a traditional Eighth Amendment deliberate indifference analysis, the court would ask whether the respondents subjectively knew of the substantial risk to detainees' health.  See Leite, 911 F.3d at 52; Farmer, 511 U.S. at 837 (defining the "deliberate" part of "deliberate indifference" to require that a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").  If a prison official is aware of the risk, "they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided."  Burrell, 307 F.3d at 8 (citing Farmer, 511 U.S. at 844).  "[A] reasonable response clearly defeats the claim of constitutional violation."  Id.

Courts that apply Kingsley to pretrial detainee due process claims also consider the reasonableness of the defendant's response to conditions that pose an excessive risk to detainee health or safety.  See, e.g., Darnell, 849 F.3d at 35 (holding a pretrial detainee has established a claim for deliberate indifference to conditions of confinement if he proves the defendant intentionally or recklessly "failed to act with reasonable care" to mitigate a condition that "posed an excessive risk to health or safety" (emphasis added)); Gordon v.

Cty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018) (directing courts to consider whether the defendant failed to take "reasonable available measures" to abate a "substantial risk" of the detainee "suffering serious harm" (emphasis added)).

Therefore, whether the court applies the Eighth Amendment's subjective deliberate indifference test, or the post-Kingsley objective deliberate indifference test, the court must consider whether respondents have taken reasonable steps to abate the risk.  If respondents' steps are reasonable, then petitioners would be unlikely to succeed on the merits of their due process claim under either test.  See Burrell, 307 F.3d at 8.

The answer to this question at this early stage is a close call.  And the case law analyzing due process claims brought by lower-risk detainees, while largely new and undeveloped, gives the court pause.  One court within this circuit has concluded that a lower-risk detainee was likely to succeed on the merits of his habeas corpus petition after several inmates in the facility tested positive for COVID-19.  See Sallaj, 2020 WL 1975819, at *3.  Several other courts have concluded that—absent evidence of COVID-19 in the facility—a lower-risk petitioner is unlikely to succeed on the merits of his due process claim. See, e.g., Coreas, 2020 WL 1663133, at *11; Sacal-Micha v. Longoria, No. 1:20-CV-37, 2020 WL 1518861, at *2 (S.D. Tex. Mar.

27, 2020); Basank, 2020 WL 1481503, at *4.  Additional courts,
having certified a class that includes both high- and lower-risk
detainees, elected to give all class members bail hearings
pending the resolution of their habeas corpus petitions.  See
Zepeda Rivas, 2020 WL 2059848, at *3; Savino, 2020 WL 1703844,
at *8.

At the time of the May 1 hearing, many of SCHOC's efforts
to ameliorate the dangers of COVID-19 were nascent and had yet
to be fully implemented.  And the court has no evidence that
COVID-19 is present in SCHOC.  Therefore, because it is a close
call whether detainees who do not have a high-risk condition
have demonstrated that they are likely to succeed on the merits
of their habeas claims, the court will hold this portion of its
ruling in abeyance.

This will allow the court to determine whether respondents'
mitigation efforts have been implemented.  The additional time
will also allow the respondents the opportunity to consider
implementing additional protective measures including those
contained in a May 6 report from the CDC about COVID-19 in
Correctional and Detention Facilities; for example, that
detention facilities "assign staff members to consistent
locations to limit movement between facility areas."  CDC
Detention Report.  In addition, this court notes Superintendent

Brackett's stated intent to explore other protective measures, including for high-risk inmates.[45]  Cf. Farmer, 511 U.S. at 845 (where equitable relief is sought, seeking "to prevent a substantial risk of serious injury from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct': their attitudes and conduct at the time suit is brought and persisting thereafter" (internal citation omitted) (quoting Helling, 509 U.S. at 36)).

The court urges respondents to exercise their authority to reassess whether detainees who are not a danger to the community or a risk of flight could be more appropriately detained in a non-carceral setting such as home confinement.  Once the court has concluded the bail hearings for high-risk detainees, and respondents have had a further opportunity to exercise discretion and voluntarily reassess custody, the court will revisit the question of lower-risk detainees' entitlement to bail hearings.

The court orders the parties to immediately notify the court should any inmate or staff member at SCHOC test positive

---

[45] As of May 14, the court had denied bail to 4 of 11 high-risk detainees.  The efforts at the SCHOC to protect these particularly vulnerable detainees is of great concern to the court.

for COVID-19.  At that time, the court will consider the
likelihood that lower-risk detainees will succeed on their due
process claim in light of the presence of COVID-19 in the
facility and the measures SCHOC has taken at that time in
response to that risk.[46]

### III. **May 29, 2020 hearing**

The court will hold a hearing on May 29 about measures to
reduce the risk of COVID-19 at SCHOC.  At that time, the court
would like to hear from the parties, through stipulated facts,
memoranda supported by appropriate record citations, and/or
affidavits or live testimony, about the following:

### a. **Identification of High-Risk Detainees:**

- What guidance does SCHOC rely on in deciding whether a
  detainee's medical condition places him at "high risk"?

---

[46] On May 1, Superintendent Bracket testified that SCHOC has two
negative pressures cells that can house three people each and
has the capacity to make Unit F, the current quarantine unit, a
negative pressure environment.  If an inmate or detainee becomes
infected with the virus, SCHOC's plan is to quarantine that
person in one of the negative pressure cells and then coordinate
with DHS to formulate next steps.  SCHOC does not currently have
a plan to deal with an outbreak that exceeds the capacity of the
negative pressure cells.  SCHOC has about 700 N95 masks and
other personal protective equipment (e.g. gowns and face
shields) that it is holding in reserve to use should an outbreak
of the virus occur.

- Does SCHOC's interpretation of this guidance recognize that CDC/ERO documents are non-exhaustive ("including but not limited to") and that some comorbidities which may not be explicitly included in these documents, such as hypertension, also make detainees with these conditions "high risk"?

- What is the process at SCHOC to screen incoming detainees for high-risk medical conditions?

- Who is involved in this process?  Who makes the final decision as to who is a "high-risk" detainee?

- How long does this process take and what measures are put in place to protect detainees prior to its completion?

- How many detainees absent court involvement has SCHOC designated as "high risk?"

- Is SCHOC following the ERO's Pandemic Response Requirements and notifying ICE after identifying detainees "as soon as practicable, but in no case more than 12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19."

b. **Reassessing Custody for High-Risk Detainees:**

- Is ICE following ERO guidance and reassessing whether continued detention is appropriate?  See Response Requirements at 14; Resp. Ex. 19.

- How many high-risk detainees at SCHOC has ICE released to non-carceral detention since this lawsuit was filed absent court order?

- How many high-risk detainees remain detained at SCHOC?

c. **Protective Measures for High-Risk Detainees:**

- Can SCHOC test each "high risk" detainee to confirm they do not have COIVD-19?

- Before SCHOC exposes a high-risk detainee to a different/new inmate in a unit or cell, can the SCHOC test the new inmate to confirm they do not have COVID-19?

- What measures has SCHOC implemented to protect high-risk detainees who remain detained?

- Are there additional steps that SCHOC would like to take but has been unable to take?  What impediments stand in the way of implementing additional protective measures?

**d. <u>Testing and Contact Tracing:</u>**

- What circumstances trigger testing of a staff member (e.g. exposure to infected person outside of work, symptoms, etc)?

- What circumstances trigger testing of an inmate/detainee (what specific symptom threshold, transport to hospital or other location outside of prison, etc)?

- If an inmate or employee is given a rapid test, but tests negative, is a follow-up test administered?

- If an inmate has a symptom, must he self-report it?  How is the symptom monitored?  If the inmate does not receive a test, is SCHOC tracking symptoms that do not trigger the testing protocol?

- Has SCHOC considered randomly testing detainees or inmates?

- Are new inmates/detainees tested when they arrive?  If not, why not?

- What impediments prevent SCHOC from testing all inmates?

- Does SCHOC have a written policy related to contract tracing?

**e. Reducing Risk COVID-19 will be Introduced at SCHOC:**

- On May 1, Superintendent Brackett testified that staff are screened prior to entering SCHOC.  Given the high percentage of identified COVID-19 cases in asymptomatic individuals, what efforts, if any, has SCHOC taken to reduce the risk that COVID-19 will be introduced into SCHOC by someone who is asymptomatic but positive for COVID-19?

- Since May 1, have airlift detainees from detention facilities with known COVID-19 cases such as Wyatt and Bristol proceeded directly to Pease, as Superintendent Brackett testified would occur, or have detainees from facilities with known COVID-19 cases entered SCHOC?

- If a detainee enters SCHOC from a facility with no known cases of COVID-19, but a case is later identified at the detainee's previous facility, what would occur at SCHOC with regard to the detainee and those who have been in contact with him or her?

- Who other than staff of SCHOC enters the facility and what measures has SCHOC put in place to reduce the risk that one of these non-employees will introduce COVID-19?

- As of May 1, clergy and attorneys continued to conduct in-person visits at SCHOC.  Does the jail have any procedures for these visits with regard to masks, social distancing, or other measures to reduce the risk of COVID-19?

**f. Reducing Risk COVID-19 would Spread Throughout SCHOC:**

- Are SCHOC employees still rotating between housing units?

- What efforts are respondents taking to identify lower-risk detainees and release those who are not a risk of flight or danger to the community?

- Since this lawsuit was filed, how many detainees has ICE voluntarily released to non-carceral detention?

- Do inmates that work in different parts of the jail (e.g. kitchen) live in different housing units? In other words, allowing inmates from different housing units to mix while at work and then return to respective units.

- If an inmate or detainee tests positive for COVID-19, what is SCHOC's response plan?

- If an employee at SCHOC tests positive for COVID-19, what is SCHOC's response plan?

- Are there additional measures SCHOC would like to put in place in response to COVID-19 but is unable to do so?

- What additional personal protective equipment does SCHOC need should COVID-19 enter the facility?

The court will rely on the evidence adduced at this hearing in resolving the parties' remaining motions.

**SO ORDERED.**

_____
Landya McCafferty
United States District Judge

May 14, 2020

cc: Counsel of Record.