**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

Robson Xavier Gomes

  v.         Civil No. 20-cv-453-LM
             Opinion No. 2020 DNH 111
US Department of Homeland Security,
Acting Secretary et al.


**O R D E R**

  In this case, a group of detainees being held by
Immigration and Customs Enforcement ("ICE") at the Strafford
County House of Corrections ("SCHOC") challenge their
confinement in light of the COVID-19 pandemic.  Petitioners
filed a petition for writ of habeas corpus and class complaint
(doc. no. 5) alleging that respondents have acted with
deliberate indifference by subjecting them to a substantial risk
of severe injury or death from COVID-19.  Petitioners seek
declaratory and injunctive relief, including release.

  In a prior order, the court found that detainees with
medical conditions placing them in a high-risk category with
respect to COVID-19 are entitled to bail hearings.  See Doc. no.
123.  The court left open the question whether detainees without
such medical conditions ("lower-risk" detainees) are also
entitled to bail hearings.  This order answers that question.

**LEGAL STANDARD**

As the court has held, a habeas petitioner is entitled to a bail hearing if he demonstrates a substantial claim of constitutional error and extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective.  See Mapp v. Reno, 241 F.3d 221, 230 (2d Cir. 2001)); Glynn v. Donnelly, 470 F.2d 95, 98 (1st Cir. 1972).  A habeas petitioner demonstrates that he has a substantial claim of constitutional error by showing he is likely to succeed on the merits of his habeas petition.

**BACKGROUND**

In its May 14 Order, the court summarized the relevant facts and procedural history in this case.  Doc. no. 123.  The court assumes the reader is familiar with that history.

In that order, the court concluded after a day-long evidentiary hearing on May 1 that it was a close call whether lower-risk detainees were likely to prevail on their constitutional claims, especially given the absence of any reported COVID-19 cases within SCHOC.  Doc. no. 123 at 55.  The court held that portion of its ruling in abeyance and scheduled a further evidentiary hearing for May 29.  The court instructed the parties to address specific questions about respondents' measures to reduce the risk of COVID-19 entering and spreading at SCHOC.  The court also ordered the parties to immediately

notify the court if anyone at SCHOC tested positive for COVID-19.

The next day, on May 15, an asymptomatic member of SCHOC's medical administration staff tested positive for COVID-19.  She was tested as part of a Strafford County initiative which provided monetary incentives for county employees who agreed to receive a COVID-19 test.  The staff member stayed out of work until she tested negative on two subsequent COVID-19 tests.

On May 16, an ICE detainee who had been transferred from another ICE detention facility two days prior tested positive for COVID-19.  This detainee exhibited mild COVID-19 symptoms at intake and was immediately isolated and tested.

On May 19, a second ICE detainee tested positive for COVID-19.  The second detainee entered SCHOC on May 14 after being arrested in Connecticut.  He did not exhibit COVID-19 symptoms at intake but was tested at a hospital when he was admitted for diabetes management.  SCHOC isolated the five individuals who had been exposed to the second detainee and administered COVID-19 tests, none of which came back positive.  No additional staff members, detainees, or inmates have subsequently tested positive for COVID-19; however, testing has been limited.[1]

---

[1] Based on information contained in respondents' weekly status reports, fifteen COVID-19 tests have been administered to detainees at SCHOC between May 14 and June 3, no tests were administered from June 3 to June 24, and five tests were

The court held its second evidentiary hearing about the conditions of confinement at SCHOC over two days on May 29 and June 1. Four witnesses testified at this hearing: Jairo Ruben Hernandez, an ICE detainee at SCHOC; Alan Greenbaum, an Assistant Field Office Director for ICE; Christopher Brackett, Superintendent at SCHOC; and Tracy Warren, Medical Administrator at SCHOC. Based on the evidence adduced at both evidentiary hearings and the arguments in the parties' pleadings, the court concludes that lower-risk detainees have not demonstrated that they are likely to succeed on their claims. They are not entitled, therefore, to bail hearings pending a ruling on the merits of their claims.

## DISCUSSION

In its May 14 Order, the court laid out the two standards that could apply to petitioners' deliberate indifference claims. One is the standard applied when the plaintiff is a convicted prisoner: government officials violate the Eighth Amendment if they act "with deliberate indifference to a substantial risk of serious harm to health." Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011); accord Farmer v. Brennan, 511 U.S. 825, 835 (1994); see also Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018). This standard has a subjective component; to

---

administered from June 24 to July 1, 2020. Doc. nos. 151, 171, 185, 192, 205, 208, 216.

satisfy it, the petitioners "must provide evidence that the [respondent] had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (quotation marks and citation omitted).  The requisite mental state is said to be "characterized by obduracy and wantonness, not inadvertence or error in good faith," and "has been likened to ... criminal recklessness." Leite, 911 F.3d at 52-53 (quotation marks omitted).

A second possible standard emerges from the Supreme Court's opinion in Kingsley v. Hendrickson, where the Court concluded that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." Kingsley, 576 U.S. 389, 397-98 (2015).  Since Kingsley, some courts have applied an objective standard outside of the excessive force context and have concluded that a civil detainee can establish a due process violation for unconstitutional conditions of confinement by showing that a government official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [civil] detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to the plaintiff's health or safety." Charles v. Orange Cty., 925 F.3d 73, 87 (2d Cir. 2019) (emphasis in original, internal quotation marks and alterations

omitted); see also Banks v. Booth, No. CV 20-849(CKK), 2020 WL 1914896, at *5 (D.D.C. Apr. 19, 2020) (holding a civil detainee "need only show that prison conditions are objectively unreasonable in order to state a claim under the due process clause"); Estate of Vallina v. Cty. of Teller Sheriff's Office, 757 F. App'x 643, 646 (10th Cir. 2018) (noting that Second, Seventh, and Ninth Circuits have "adopted an objective test" requiring "reckless disregard," while the Fifth, Eighth, and Eleventh Circuits have held that Kingsley does not extend to detainee medical care claims).

The First Circuit has yet to address whether Kingsley's objective test is limited to excessive force claims or applies to other due process claims brought by civil detainees. District courts within the First Circuit have reached different conclusions on this question. See doc. no. 123 at 33-35 (collecting cases), see also Baez v. Moniz, No. CV 20-10753-LTS, 2020 WL 2527865, at *7 (D. Mass. May 18, 2020) (concluding pretrial detainees had to show subjective deliberate indifference); Yanes v. Martin, No. 120CV00216MSMPAS, 2020 WL 3047515, at *2 n.3 (D.R.I. June 2, 2020) (concluding Kingsley did away with the need for civil detainees to show "the subjective state of mind that is a hallmark of the 'deliberate indifference' or 'reckless disregard' formulations").

6

The court need not resolve this question because even applying an "objective reasonableness" test, the lower-risk petitioners have not met their burden.  The court reaches this conclusion despite the lack of any meaningful dispute that COVID-19 presents a substantial risk of serious harm to the health of even lower-risk detainees, as it does members of the society at large.  See doc. no. 123 at 50-51; Baez, 2020 WL 2527865, at *7.  Although "the harm of a COVID-19 infection will generally be more serious for some petitioners than for others" it "cannot be denied that the virus is gravely dangerous to all of us."  Savino v. Souza, No. CV 20-10617-WGY, 2020 WL 1703844, at *7 (D. Mass. Apr. 8, 2020).  A study from the CDC showed that even in patients between ages 19-64 with no underlying health conditions, the total hospitalization rate was 8-8.7%.[2]  In a different CDC study of hospitalized COVID-19 patients, 26% had no high-risk factors and—of that subpopulation—23% received ICU care and 5% died.[3]

---

[2] Nancy Chow et al., CDC, COVID-19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020, 69 Morbidity & Mortality Weekly Report 382, 382-84 (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf. (last accessed July 1, 2020).

[3] JA Gold et al., CDC, Characteristics and Clinical Outcomes of Adult Patients Hospitalized with COVID-19 — Georgia, March 2020, 69 Morbidity & Mortality Weekly Report 545, 545-50 (May 8,

Nor is there a meaningful dispute that respondents knew or should have known that COVID-19 presents a substantial risk, especially within detention facilities: many state and federal agencies have "bombarded the public and institutions with warnings."  Yanes, 2020 WL 3047515, at *2 n.3; see also doc. no. 123 at 50-51.  The question is whether petitioners have carried their burden and demonstrated that—with regard to lower-risk detainees—they are likely to succeed on their claim that conditions at SCHOC remain objectively unreasonable.  See Yanes, 2020 WL 3047515, at *2, Banks, 2020 WL 1914896, at *5.  While the respondents' approach to reducing the risks of COVID-19 has not been flawless, it has been, on balance, objectively reasonable.  The court begins by summarizing the steps respondents have taken to reduce the risk of COVID-19.

1.  Measures respondents have taken to reduce the risk of COVID-19

As the court detailed in its May 14 order, SCHOC, like many other facilities, has modified its conditions of confinement in light of the risks presented by COVID-19.  Doc. no. 123 at 15-25.  During the most recent evidentiary hearing (May 29 and June 1), the court received additional evidence about SCHOC's ongoing response to COVID-19.  This evidence is pertinent to three broad

---

2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6918e1-H.pdf.  (last accessed July 1, 2020).

categories of risk COVID-19 creates in a congregate living setting such as SCHOC: the risk the virus will be brought into the facility; the risk the virus will spread within SCHOC once there; and the risk that COVID-19 is present, but undetected, within the facility.

A. Steps to prevent virus from entering SCHOC

Respondents have taken several steps to reduce the risk that individuals with COVID-19 will enter the facility.  In March, SCHOC suspended in-person visitation except for professional visits by clergy and attorneys.  The number of professional visits has also drastically decreased. Superintendent Brackett testified that in 2019, from March 13 to May 25, approximately 350 professional visits took place; whereas, in 2020 there were only 14 professional visits over the same time period.  Doc. no. 194 at 10.  SCHOC staff and professionals who enter the facility are subjected to a screening process that includes questions about health symptoms, exposure to COVID-19, and a temperature check.  Id. at 10, 103. SCHOC requires staff and professional visitors to wear masks within the facility.  Id.  Inmates or detainees entering SCHOC are screened for symptoms, and then held in a quarantine unit for fourteen days before entering the general population.  Any

detainee who leaves SCHOC for a medical or court appointment is also quarantined upon return to the facility.

On May 20, Superintendent Brackett emailed Alan Greenbaum requesting that ICE stop transferring detainees into SCHOC from facilities with known cases of COVID-19.  Resp. Ex. P.  Alan Greenbaum subsequently decided to stop all transfers into SCHOC from all other ICE detention facilities.  Doc. no. 193 at 107-08, 175-76.  Currently, the only way a new detainee enters SCHOC is if the detainee is arrested in the community and ICE elects to house him or her at SCHOC.  Id.  Because ICE has elected to reduce enforcement actions in light of the COVID-19 pandemic, fewer individuals are being taken into custody.  According to ICE's daily apprehension log, 70% fewer individuals have been taken into custody within the Boston area of responsibility from March through May 2020 compared to the same time period in 2019. Resp. Ex. C.

B. Steps to reduce risk of virus spreading within SCHOC

Respondents have also taken meaningful steps to control and militate against the spread of COVID-19 within SCHOC. Respondents did not allow the staff member who tested positive for COVID-19 to return to work until after multiple tests came back negative.  SCHOC's intake screening process, which includes isolating and testing symptomatic individuals, prevented additional detainees from being exposed to the detainee who

exhibited mild COVID-19 symptoms at intake and ultimately tested positive.  Although the second detainee did not exhibit symptoms of COVID-19 at intake, SCHOC's practice of limiting a new detainee's contact to others during intake meant that only five additional detainees and inmates were exposed.  After the second detainee tested positive for COVID-19, SCHOC was able through contact tracing to quickly identify the five detainees. The five detainees were isolated and tested.  Over the last month, no additional staff members or detainees have tested positive for COVID-19.[4]

In addition, the overall population at SCHOC is well below capacity.  As of July 1, the average weekly population at Stafford County was 305, approximately 62% of its maximum 495-inmate capacity, and a reduction from the 320 inmates detained at SCHOC as of April 30.  See doc. nos. 208 at 2; 40 at 4; 123 at 14.  All detainees and staff members have received face masks and SCHOC policy requires staff to wear masks at all times when interacting with detainees.  Although some inmates leave their

---

[4] While it is good that no additional staff members or detainees have tested positive since May 19, it appears that testing of both groups has been limited.  Respondents' status reports state no detainees have been tested since June 3.  Given SCHOC's screening protocols for employees and testing protocols for symptomatic detainees, the court interprets the lack of positive COVID-19 tests as an indicator that there have been no symptomatic cases of COVID-19 at SCHOC since May 19.

housing unit to work in other parts of the jail, such as in the kitchen or at the jail industries building—where inmates can participate in a skill-building program—these detainees must wear masks when outside their assigned unit.  Doc. no. 194 at 16.  These detainees also all live in the same unit at SCHOC, Unit J.  Doc. no. 194 at 13-14.  The decision to house all detainees who work outside their housing units together reduces the risk that detainees from multiple units will come into contact with one another and spread COVID-19 throughout the facility.

Under the SCHOC lockdown policy, see doc. 123 at 16-17, the number of detainees out of their cells on "tier time" at any one time is limited.  This reduces detainee interactions and decreases the risk that someone with COVID-19 will spread the infection to others within the unit.  Detainees clean the common area before a new group of detainees are released on tier time.  Doc. no. 193 at 16-17.  SCHOC has recently improved its cleaning procedures, and cleaning and hygiene supplies are available to all detainees.  Doc. no. 123 at 19; 194 at 16-17.

   C. Steps to reduce risk that the virus is present but
      undetected

Finally, a number of steps have been implemented at SCHOC to identify staff and detainees who may be infected with COVID-19.  In May, Stafford County incentivized county employees to be

tested for COVID-19. Fifty-two percent of SCHOC's correction officers and 65% of its medical staff elected to be tested. Doc. no. 194 at 31.  It was through this testing that the asymptomatic staff member was identified as COVID-19 positive. With regard to detainees, those who have been at SCHOC for fewer than 14 days are quarantined, and staff members check them for heightened temperature and conduct a risk-factor screening test twice a day.  Doc. no. 194 at 95.  For detainees not on quarantine, SCHOC conducts a temperature screening every two or three weeks. Doc. no. 193 at 12, 123 at 19.

Having summarized the positive steps taken at SCHOC to protect detainees, the court next examines the deficiencies that remain.

2.  <u>Remaining Deficiencies within SCHOC</u>

Respondents' efforts to reduce the risk of COVID-19 at SCHOC have not been flawless.  ICE detainees at SCHOC, unlike ICE detainees at other facilities in New England, are quarantined and housed together with inmates who are awaiting trial after having been charged with crimes ("pretrial detainees") and convicted inmates serving their sentences at SCHOC.  Although ICE has stopped transferring ICE detainees from other ICE facilities, there was no evidence that SCHOC has prohibited or limited transfers of pretrial detainees or convicted inmates.  Nor was there any evidence about whether

fewer individuals are being charged with crimes, arrested, or detained due to the pandemic.  Accordingly, even though the number of ICE detainees at SCHOC is likely to decrease, the overall population at SCHOC may remain unchanged or go up depending on the number of pretrial detainees and convicted inmates who enter the facility.

ICE detainees also remain unable to physically separate themselves from one another due to the size and layout of detention cells and the barracks-style unit.  Although respondents have attempted to limit interaction between detained individuals by limiting the number of people released from their cells for "tier time," on occasion, more people have been out of their cells at the same time than intended.  Doc. nos. 193 at 34; 194 at 19.[5]  And, although it is difficult for detainees to remain physically separated while in their unit, SCHOC does not require them to wear a mask.  Doc. no. 194 at 16.

Mask wearing within the facility by both inmates and staff members has also been inconsistent.  On May 29, a detainee testified that although he had received a mask a month prior, he had not received instructions about how or when to wear the mask, had not seen detainees wearing masks at SCHOC, and did not

---

[5] Superintendent Brackett testified about an occasion where staff were disciplined after a lapse resulted in more than twelve inmates being out of their cells at the same time.  Doc. no. 194 at 19-20.

know he could ask for a replacement mask when his became soiled. Doc. no. 193 at 21-22.  He also testified that at times, he had observed employees and a visiting chaplain removing their masks near detainees.  Id. at 23, 25-26, 32-33.  Superintendent Brackett also testified that he has observed staff wearing masks improperly.  Doc. no. 194 at 45.

Respondents have attempted to educate detainees about COVID-19 through signs and educational material on detainee tablets.  However, a detainee testified that he had not seen signs indicating detainees should sleep head to toe in order to reduce the risk of COVID-19 and was unable to access the information about COVID-19 on his tablet.  Doc. no. 193 at 26, 30.

With regard to cleaning, although respondents have made efforts to improve procedures at SCHOC, some of the detainees who clean common spaces in the unit have not received training, doc. no. 193 at 19, and the common showers remain "dirty" and are only cleaned once a day.  Id. at 20-21; see also doc. no. 194 at 18-19 (Superintendent Brackett acknowledged that showers are moldy and that SCHOC was taking steps to try to address the situation).

While policies are in place to confine inmates to particular units, the facility does not keep officers assigned to consistent locations within the facility.  This practice is

inconsistent with the CDC interim guidance and a CDC Detention Report, which encourage facilities to "[a]ssign staff members to consistent locations" in order to prevent spread of COVID-19 within the facility.  See Resp. Ex. E; CDC, Megan Wallace et al, COVID-19 in Correctional and Detention Facilities- United States, February-April 2020, 69 Morbidity & Mortality Weekly Report 587, 587-90 (May 15, 2020).[6]

A major shortcoming at SCHOC is that testing is not required for asymptomatic employees.  Given that SCHOC does not restrict employees to particular units, its failure to test all employees could potentially cause asymptomatic carriers to spread the virus within the facility.

In addition, testing of asymptomatic inmates for COVID-19 is nonexistent.  For example, ICE detainees, pretrial detainees, and criminal inmates entering SCHOC are not tested for COVID-19. Moreover, although CDC guidance instructs, "[i]f at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started," Superintendent Brackett testified he is unable to follow this guidance due to "design constraints of the facility."[7]  Doc. no.

---

[6] Available at: https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6919e1-H.pdf. (last accessed July 1, 2020).

[7] Superintendent Brackett testified that he attempts to house individuals in single cells during quarantine when possible.  Doc. no. 115 at 49-50.  If SCHOC needs to put two individuals in the same cell, Superintended Brackett attempts to

116 at 20; Resp. Ex. 5 at 20 from May 1, 2020 hearing.
Therefore, an individual entering the facility with asymptomatic
COVID-19 could infect other quarantined inmates who may be
reaching the end of their quarantine period.  So long as these
individuals remained asymptomatic, they would be released from
quarantine to the general population at SCHOC without additional
testing.  This is one way in which COVID-19 could spread
throughout SCHOC.

At the May 29 evidentiary hearing, Alan Greenbaum testified
that ICE was not testing asymptomatic detainees because
widespread testing of asymptomatic individuals was "not
recommended by the CDC."  See doc. no. 193 at 144, 179-80, 183;
see also Resp. Ex. JJ.  However, on June 13, 2020, the CDC
reversed course and issued new guidance recommending "testing
for asymptomatic individuals" in "correctional and detention
facilities."  CDC, Overview of Testing for SARS-CoV-2, (revised
June 13, 2020) https://www.cdc.gov/coronavirus/2019-
ncov/hcp/testingoverview.html (last accessed July 1, 2020).
This new CDC guidance[8] states:

> Certain settings can experience rapid spread of SARS-
> CoV-2, resulting in substantial adverse effects.  This

─────────────────────
"double people up in close conjunction with those that have been
brought in and incarcerated at the same time."  Id.

[8] The CDC Guidance refers to SARS-CoV-2. To be clear, SARS-
CoV-2 is the virus that causes the disease commonly referred to
as "COVID-19." In this order, the court uses the term COVID-19
broadly, to be inclusive of both the virus and the disease.

is particularly true for settings that house
vulnerable populations in close quarters for extended
periods of time (e.g., long-term care facilities,
correctional and detention facilities) and/or settings
where critical infrastructure workers (e.g.,
healthcare personnel, first responders) may be
disproportionately affected.

A strategy aimed at reducing introduction of SARS-CoV-
2 into the setting through early identification could
reduce the risk of widespread transmission in these
situations.

Facilities are encouraged to work with local,
territorial, and state health departments to help
inform decision-making about broad-based testing.
Before testing large numbers of asymptomatic
individuals without known or suspected exposure, the
facility should have a plan in place for how it will
modify operations based on test results.

Approaches for early identification of asymptomatic
individuals include:

- Initial testing of everyone residing and/or working
  in the setting,
- Regular (e.g., weekly) testing of everyone residing
  and/or working in the setting, and
- Testing of new entrants into the setting and/or
  those re-entering after a prolonged absence (e.g.,
  one or more days)

At the May 1 evidentiary hearing, Superintendent Brackett

testified that he considered CDC guidance about responding to

the risk of COVID-19 in detention facilities to be his "bible"

as he "tried to navigate proper operation of the facility."

Doc. no. 115 at 96.  Now that the CDC has issued new guidance

recommending testing of asymptomatic staff and inmates in

detention facilities, the court is confident that respondents

will rely on the updated CDC recommendations to develop new

testing protocols.  This is especially true where testing availability in New Hampshire has "expanded to anyone in NH who wants a test."  See New Hampshire Department of Health and Human Services, Testing Guidance, https://www.nh.gov/covid19/resources-guidance/testing-guidance.htm (last visited July 1, 2020).

3.  Lower-risk detainees have not demonstrated that they are likely to succeed

Having carefully considered respondents' approach to reducing the risks associated with COVID-19 at SCHOC and having weighed the totality of the facts in the record at this early stage, the court is not persuaded that petitioners are likely to show that respondents have "recklessly failed to act with reasonable care" in response to substantial health risks. Charles, 925 F.3d at 87 (emphasis in original, internal quotation marks omitted).  Although respondents' measures to reduce the risk of COVID-19 within SCHOC have been imperfect, petitioners have not demonstrated that respondents recklessly failed to act with reasonable care to mitigate the risk COVID-19 presents to lower-risk detainees at SCHOC.  See id.

Other courts have reached the same conclusion considering claims and facts similar to those present here.  For example, in C.G.B. v. Wolf, the court concluded that detainees who did not have a medical condition that put them at high-risk from COVID-

19 had failed to establish a likelihood of success on the merits where detention facilities were substantially complying with ICE's COVID-19 Pandemic Response Requirements. C.G.B. v. Wolf, No. 20-CV-1072 (CRC), 2020 WL 2935111, at *25 (D.D.C. June 2, 2020). Courts have also reached this conclusion under the Eighth Amendment deliberate indifference standard. See Baez, 2020 WL 2527865, at *7, n.8 (finding standard not met where detention facility had adopted many measures and policies to reduce risk of COVID-19); Awshana v. Adducci, No. 20-10699, 2020 WL 1808906, at *14 (E.D. Mich. Apr. 9, 2020) (finding standard not met where petitioners were lower-risk, facility had followed CDC guidance to reduce the risk of COVID-19, and no detainees or staff had tested positive).

In contrast, those courts that have found the post-Kingsley standard met by lower-risk detainees have involved more egregious facts. See Ahlman v. Barnes, No. SACV20835JGBSHKX, 2020 WL 2754938, at *12 (C.D. Cal. May 26, 2020) (finding post-Kingsley standard met where rates of COVID-19 were "skyrocketing" and 369 inmates had tested positive for COVID-19; Zepeda Rivas v. Jennings, No. 20-CV-02731-VC, 2020 WL 2059848, at *2, n.6 (N.D. Cal. Apr. 29, 2020) (finding post-Kingsley standard met where ICE had only recently begun taking "modest measures" and respondents had yet to identify detainees with health vulnerabilities).

A critical factor driving the court's conclusion is the court's confidence in Superintendent Brackett, who testified at both evidentiary hearings.  Superintendent Brackett is credible; he is willing to admit the flaws and does not exaggerate the successes in his approach.  He is devoted to the cause of keeping those in his custody safe; he reads the guidance from the CDC and makes decisions based on that guidance.  While the court wishes Superintendent Brackett had not deferred to others on the question of how best to protect the high-risk detainees, petitioners have not demonstrated that respondents' approach to lower-risk detainees is—on balance—objectively unreasonable.

For all these reasons, the court denies petitioners' request to grant lower-risk detainees bail hearings pending a ruling on the merits.

## CONCLUSION

For the foregoing reasons, petitioners' motion for expedited bail hearings (doc. no. 9) is denied with regard to lower-risk detainees.

Several motions remain pending before the court: petitioners' amended petition for writ of habeas corpus and class complaint (doc. no. 5); petitioners' motion for a preliminary injunction (doc. no. 7); and petitioners' motion to certify the class (doc. no. 14).  Since petitioners filed these

21

motions in April, there have been significant factual and procedural developments in this case. Therefore, the court gives the parties until July 15 to supplement their pleadings to address subsequent developments. The court invites the parties to address whether petitioners' motion for a preliminary injunction (doc. no. 7) has been mooted by respondents' decision to stop transfers from other ICE detention facilities. The parties may also supplement their class certification pleadings. Finally, the court orders the parties to file a status report on or before July 15, stating their joint or separate positions regarding how, and on what schedule, this matter should proceed on the merits.

      **SO ORDERED.**

                             _____
                             Landya McCafferty
                             United States District Judge

July 1, 2020

cc: Counsel of Record.